IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,130

HODES & NAUSER, MDS, P.A.; and TRACI LYNN NAUSER, M.D.,
*Appellees*,

v.

KRIS KOBACH,
in His Official Capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE,
in His Official Capacity as
District Attorney for Johnson County,
*Appellants*.

SYLLABUS BY THE COURT

1.

The law-of-the-case doctrine restricts a party from relitigating an issue already decided on appeal in successive stages of the same proceeding.

2.

Exceptions to the law-of-the-case doctrine are when (1) a subsequent trial produces substantially different evidence; (2) a controlling authority has made a contrary decision regarding the law applicable to the issues; or (3) the prior decision was clearly erroneous and would work a manifest injustice.

3.

Section 1 of the Kansas Constitution Bill of Rights protects a fundamental right to personal autonomy, which includes the right to decide whether to terminate a pregnancy.

1

**4.**

Impairment of the right to terminate a pregnancy must withstand strict scrutiny. The plaintiff carries the burden to show government action impairs this right.

**5.**

Once the plaintiff shows government action impairs the right to terminate a pregnancy, the burden shifts to the government to show that this impairment withstands strict scrutiny. Under the strict scrutiny standard, the government must show three things: (1) it has a compelling interest; (2) the challenged action actually furthers that interest; and (3) it does so in a way that is narrowly tailored.

**6.**

Government interests are more likely to be compelling when they are concrete and exhibit some level of specificity, rather than broad and open to wide interpretation and inclusion of a great array of concerns.

**7.**

Courts consider one or more of the following three components in deciding whether a law is narrowly tailored: whether the government's action is necessary, whether the government's action is underinclusive, and whether the government's action is overinclusive.

**8.**

The government must rely on actual evidence to show its action withstands strict scrutiny.

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Oral argument held on March 27, 2023. Opinion filed July 5, 2024. Affirmed.

*Anthony J. Powell*, solicitor general, argued the cause, and *Brant M. Laue*, former solicitor general, *Jeffrey A. Chanay*, former chief deputy attorney general, *Dwight R. Carswell,* deputy solicitor general, *Shannon Grammel*, former deputy solicitor general, and *Derek Schmidt*, former attorney general, were on the briefs for appellants.

*Jiaman Wang*, pro hac vice, of Center for Reproductive Rights, of New York, New York, argued the cause, and *Genevieve Scott*, pro hac vice, of the same organization, *Paul Rodney*, pro hac vice, of Arnold & Porter Kaye Scholer LLP, of Denver, Colorado, and *Teresa A. Woody*, of The Woody Law Firm P.C., of Kansas City, Missouri, were with her on the brief for appellees.

The opinion of the court was delivered by

ROSEN, J.:  This case returns after we held in 2019 that the Kansas Constitution protects a fundamental right of personal autonomy, "which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy." Government infringement of that right must withstand strict scrutiny. *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 614, 440 P.3d 461 (2019) (*Hodes I*). We remanded the case to the district court to apply this standard to whatever evidence the parties offered so it could determine whether legislation banning the most common method of second-trimester abortion violates this protection. The district court found the only evidence offered demonstrated there was "no reasonable alternative" to that procedure. It held the State failed to carry its burden to show the legislation was constitutional and imposed a permanent injunction. This is the direct appeal from that decision. We affirm the district court's order.

FACTUAL AND PROCEDURAL HISTORY

In 2015, the Kansas Legislature enacted S.B. 95. *Hodes I*, 309 Kan. at 614; K.S.A. 65-6741 et seq. S.B. 95 effectively bans a common method of second-trimester abortion called Dilation and Evacuation except when a D & E is "necessary to preserve the life of the pregnant women" or to prevent a "substantial and irreversible physical impairment of a major bodily function of the pregnant woman." K.S.A. 65-6743(a). The bill was scheduled to go into effect on July 1, 2015. K.S.A. 65-6741.

But on June 1, 2015, Herbert C. Hodes, M.D., Traci Lynn Nauser, M.D., and Hodes & Nauser, MDs, P.A., (Providers), doctors who perform D & E abortions in Kansas, sued. They contended sections 1 and 2 of the Kansas Constitution Bill of Rights protect a right to abortion and that S.B. 95 violates this right. The Providers filed a motion for temporary injunction to prevent S.B. 95 from taking effect while the case moved forward.

The defendants (then Derek Schmidt as the Attorney General of Kansas and Stephen Howe as the district attorney for Johnson County, now Kris Kobach as the Attorney General of Kansas and Howe) (the State) opposed the temporary injunction. The State argued there is no right to abortion under the Kansas Constitution. Alternatively, the State argued even if there is a Kansas constitutional right to abortion, S.B. 95 did not violate that right because alternative methods of second-trimester abortion are available.

The district court granted the temporary injunction after concluding the Providers were substantially likely to prevail on their claim that S.B. 95 violates the Kansas Constitution Bill of Rights. It concluded the Kansas Constitution protects a right to abortion to the same extent the federal Constitution protected a right to abortion at that

time. The State immediately appealed from this temporary injunction to the Court of Appeals under K.S.A. 2014 Supp. 60-2102(a)(2).

Sitting en banc, an evenly divided Court of Appeals affirmed the district court. *Hodes & Nauser, MDs, P.A. v. Schmidt*, 52 Kan. App. 2d 274, 368 P.3d 667 (2016). Seven judges concluded the Kansas Constitution protects a right to an abortion and concluded the injunction should be affirmed. 52 Kan. App. 2d at 275. Six of those judges applied an undue burden standard developed in *Planned Parenthood of Southeastern PA. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). *Hodes*, 52 Kan. App. 2d at 290-91. Judge Atcheson concurred but believed a standard akin to strict scrutiny was more appropriate. 52 Kan. App. 2d at 328. The seven remaining judges dissented, concluding there was no right to an abortion under the Kansas Constitution. 52 Kan. App. 2d at 330. Because the panel split evenly on the result, the district court was affirmed. 52 Kan. App. 2d at 295. The State appealed to this court.

We affirmed the temporary injunction. We ruled section 1 of the Kansas Constitution Bill of Rights protects a right to choose whether to continue a pregnancy. But we departed from the lower courts' application of the undue burden standard. Because section 1 "identifies rights distinct from and broader than those listed in the Fourteenth Amendment," the federal standard provided a less rigorous method for considering whether government action violated the Kansas Constitution. *Hodes I*, 309 Kan. at 624. We reasoned that strict scrutiny, as the "most searching of . . . standards," was the better test to utilize when considering whether the government would be permitted to curtail a fundamental right protected by section 1. 309 Kan. at 663. We explained, "Under our strict scrutiny standard, the State is prohibited from restricting that right unless it can show it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest." 309 Kan. at 680.

5

We agreed with the district court's holding that the plaintiffs were substantially likely to succeed on their claim that S.B. 95 violates the Kansas Constitution. Although we ruled that strict scrutiny, rather than the undue burden standard used by the district court, is the appropriate test, we reasoned that applying strict scrutiny would not change the outcome because strict scrutiny is more demanding on the State and thus a less rigorous standard for the plaintiffs to meet. *Hodes I*, 309 Kan. at 677.

We remanded the case to the district court with instructions to proceed to the full merits of the case so both sides could present evidence and arguments supporting their respective positions. We explained that, upon remand, "the State is certainly free to assert any interests it believes compelling and show how S.B. 95 is narrowly tailored to those interests." *Hodes I*, 309 Kan. at 680-81.

Back before the district court, the parties filed a joint stipulation dismissing plaintiff Herbert Hodes, who retired during the appellate proceedings. The parties entered discovery, during which the Providers served the State with requests for production of documents and interrogatories. The State served no written discovery on the Providers. The Providers disclosed three fact and expert witnesses:  Plaintiff Dr. Nauser; Dr. Anne Davis, a medical expert in obstetrics and gynecology; and Dr. Thomas Cunningham, an expert in clinical ethics, bioethics, philosophical ethics, and philosophy of medicine. The State did not depose any of the Providers' witnesses. The Providers deposed the State's only disclosed expert, but the State later withdrew that witness "given the failure of our own expert." After discovery closed, the parties filed cross-motions for summary judgment.

In its motion, the State argued three legally compelling interests motivated S.B. 95:  (1) promoting respect for the value of, and the dignity of, human life, born or unborn; (2) protecting the interests of innocent third parties; and (3) regulation and protection of the medical profession and the medical care provided to Kansans. It asserted S.B. 95

6

furthers these interests by banning the most "undignified" method of second-trimester abortion. To its motion, the State attached legislative testimony in opposition to and in support of S.B. 95 as "illustrative facts of the information that was before the legislature when it was considering the bill," but acknowledged this information was "not offered as claiming the truth or anything, but just illustrating what the legislature had in mind and the—the purposes and interests it was contemplating while it was considering the bill itself."

In the Providers' motion, they argued the State failed to show any of its asserted interests are compelling or that S.B. 95 furthers those interests. The Providers also argued that, even if the State had met this burden, it failed to show S.B. 95 was narrowly tailored to the asserted interests. The Providers attached to its motion expert and fact declarations under oath from their three expert witnesses.

On April 7, 2021, the district court granted summary judgment for the Providers. It held the uncontroverted facts showed S.B. 95 does not withstand strict scrutiny and consequently violated section 1 of the Kansas Constitution Bill of Rights.

In its ruling, the district court observed that Kansas law prohibits abortion after viability except "when the abortion is 'necessary to preserve the life of the pregnant woman' or 'continuation of the pregnancy will cause a substantial and irreversible impairment of a major bodily function of the pregnant woman.'" It found that doctors in Kansas perform the D & E between 14 weeks from the last menstrual period and viability, and that it is the safest and most common form of second-trimester abortion. The court's findings described the procedure:

> "[During a D & E], first, the cervix is dilated; next, a combination of suction and forceps or the safest surgical instrument is used to remove the fetus, placenta, and uterine lining. Dr. Davis said usually, because the cervix is narrower than the fetus, some separation of

7

fetal tissue occurs as the physician withdraws the fetal tissue and brings it through the cervix."

The district court found as uncontroverted facts:

"27. The risk of death to the mother associated with childbirth in the United States is approximately 14 times higher than that associated with abortion, estimated to be 8.8 per 100,000 live births compared to 0.7 per 100,000 abortion procedures.

"28. Abortion-related death of the mother is lower than that for other common outpatient medical procedures, such as colonoscopy (2.9 deaths per 100,000 procedures).

"29. Major complications occur in less than 1% of D & E cases. The low complication rate for second trimester abortion is, in large part, attributable to the low complication rate for the D & E method itself.

"30. D & E can be performed on an outpatient basis in a clinical setting at a lower cost than other second trimester procedures performed after 14 weeks' gestation."

The court also made findings about the State's proposed alternatives to the D & E procedure—labor induction and delivery, inducing fetal demise prior to a D & E through digoxin injection, inducing fetal demise prior to a D & E through potassium chloride (KCl) injection, and inducing fetal demise prior to a D & E through umbilical cord transection. The court found generally that these alternatives are more dangerous, untested, or would be impossible in some cases. It also found there is no consensus on what constitutes a dignified abortion procedure and that a ban on the D & E was at odds with medical ethics.

The district court combined the State's asserted interests in "promoting respect for, the value of, and the dignity of human life, born or unborn" and "protecting the interests of innocent third parties" after noting the State had acknowledged these interests "are

8

related enough to collapse into one category to be considered together." After fusing these interests and making its factual findings, the district court issued the following rulings:

The State proved it has a compelling interest in "promoting respect for the value and dignity of human life, born and unborn."

The State failed to prove it has a compelling interest in "regulating the medical profession and maintaining the ethical integrity of the medical profession."

S.B. 95 is not narrowly tailored to the State's compelling interest in promoting respect for the value and dignity of human life, born and unborn.

Regarding its rejection of the State's positions, the court explained:

"The interest in regulating the medical profession is certainly legitimate and important. But Defendants fail to persuade that it is an interest that is extremely weighty, urgent, or rare on the same level as the government's interest in the value and dignity of human life. It is Defendants' burden to establish a compelling State interest in regulating the medical profession in this context, and they have failed to carry it.

. . . .

"The essence of Defendants' narrow tailoring argument is that even with enforcement of the Act there are other second trimester abortion options available. The burden is on the Defendants to demonstrate narrow tailoring not just in theory, but in fact. Defendants assert that a woman seeking a second trimester abortion can either elect another procedure or seek an alternative means of fetal demise prior to the D&E. The problem with this argument lies with the evidence (or lack thereof) before the Court. The evidence is that because of its safety record and availability in an outpatient setting, D&E

9

is a standard method of abortion and the most commonly used abortion procedure beginning at approximately 14 to 15 weeks LMP. . . .

. . . .

". . . Defendants offer no facts and little argument about how these alternatives for bringing death promote greater respect for the value and dignity of human life as a substitute for D&E; instead, they offer only a theory. The facts do not demonstrate that the net effect of the Act will be to bring a more dignified death to the unborn child before it is removed from the mother's body. . . ."

The State appealed to this court under K.S.A. 60-2101(b) (state statute held unconstitutional). It did not dispute the district court's factual findings. Instead, it urged us to overrule our earlier decision and hold the Kansas Constitution does not protect a right to abortion. Absent that, the State contends S.B. 95 withstands strict scrutiny review.

On August 2, 2022, Kansas voters rejected a proposed constitutional amendment to add language stating, in part, that the state Constitution "does not create or secure a right to abortion." The proposal failed by a vote of 385,014 (40.84%) in favor to 557,837 (59.16%) against. The ballot explained that a "No" vote "would make no changes to the constitution of the state of Kansas, and could restrict the people, through their elected state legislators, from regulating abortion by leaving in place the recently recognized right to abortion."

## DISCUSSION

*We affirm our earlier decision that section 1 protects a right to decide whether to terminate a pregnancy.*

10

The State devoted much of its brief to inviting us to reverse our earlier ruling in this case that the Kansas Constitution protects a right to abortion. We decline the invitation.

A linchpin of the common law is that earlier decisions guide courts and parties as to the state of the law in the present and the future.

"It seems to have been recognized from the very beginning of adjudicated cases in England that the reasonable expectations of men, built upon the distinct and solemn pronouncement of a judge or court should not be demolished at the whim of any successor; and, that to permit such practice would ultimately cause law to lose its significance as a rule of conduct, making a litigant's adventure in court akin to a journey into a wilderness of confusion." Evans, *The Development of the Doctrine of Stare Decisis and the Extent to Which It Should Be Applied*, 23 Denver L. Rev. 32, 35 (1946).

This principle takes its most vivid expression in the law-of-the-case doctrine, which restricts a party from relitigating an issue already decided on appeal in successive stages of the same proceeding. *State v. Parry*, 305 Kan. 1189, Syl. ¶ 1, 390 P.3d 879 (2017). Courts adhere to the law of the case "'"to avoid indefinite relitigation of the same issue, to obtain consistent results in the same litigation, to afford one opportunity for argument and decision of the matter at issue, and to assure the obedience of lower courts to the decisions of appellate courts. [Citations omitted.]"'" 305 Kan. at 1194.

The law-of-the-case doctrine is intended to prevent continued re-argument and avoid, "in short, Dickens's *Jarndyce v. Jarndyce* syndrome," where a case does not end until the money to pay fees runs out. *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000). It also "discourages litigants from filing subsequent appeals in hopes of obtaining a more sympathetic panel." *United States v. Agofsky*, 516 F.3d 280, 283 (5th Cir. 2008). In *Entek GRB, LLC v. Stull Ranches, LLC*, then judge Gorsuch wrote:

"Law of the case doctrine permits a court to decline the invitation to reconsider issues already resolved earlier in the life of a litigation. It's a pretty important thing too. Without something like it, an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016).

One circumstance under which the law-of-the-case doctrine comes into play is when a second appeal is brought in the same case. In that instance, the first decision is generally the settled law of the case on all questions involved in the first appeal, and "reconsideration will not normally be given to those questions." *Parry*, 305 Kan. at 1195. An argument once made to and resolved by an appellate court becomes "the law" in that case and generally cannot be challenged in a second appeal. *State v. Collier*, 263 Kan. 629, Syl. ¶ 3, 952 P.2d 1326 (1998).

Courts generally recognize only three exceptions allowing departure from the law of the case. "These exceptions apply when (1) a subsequent trial produces substantially different evidence, (2) a controlling authority has made a contrary decision regarding the law applicable to the issues, or (3) the prior decision was clearly erroneous and would work a manifest injustice. [Citations omitted.]" *State v. Kleypas*, 305 Kan. 224, 245, 382 P.3d 373 (2016).

The State ardently argues our earlier decision was flat-out wrong, thereby appearing to invoke the third exception. It most certainly does not invoke the first exception because the State presented no evidence on remand and the Providers' evidence was consistent with its sworn testimony from the preliminary injunction stage.

We have observed the need for the discretionary power to reconsider a prior ruling under limited circumstances. "If an erroneous decision has been made, it ought to be

12

corrected speedily, especially when it can be done before the litigation in which the error has been committed has terminated finally." *Railway Co. v. Merrill*, 65 Kan. 436, 451, 70 P. 358 (1902). See also *Hudson v. Riley*, 114 Kan. 332, 335, 219 P. 499 (1923) ("If there was error in the ruling it is competent for the court to correct it, and especially where it can be done before the litigation in which it occurred has been finally terminated."). But the State has given us no reason to revisit our ruling in this case.

The relevant exception to the law-of-the-case doctrine requires a showing that the original decision was clearly erroneous. The State has made no such showing. The questions it seeks to relitigate were addressed in extensive analysis in our first ruling. And the few cases it cites that have been decided since that ruling—one interpreting the federal Constitution and one interpreting the Iowa Constitution—do not control or even bring into question our interpretation of the Kansas Constitution Bill of Rights. See *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022) (reexamining federal Fourteenth Amendment precedent and holding it does not protect a right to abortion); *Planned Parenthood of the Heartland v. Reynolds*, 975 N.W.2d 710, 715 (Iowa 2022), *reh'g denied* July 5, 2022 (reexamining Iowa Constitution's due process clause and deciding it does not require strict scrutiny review while leaving undecided what constitutional standard should replace it). And at oral argument, the State referred us to *Whole Women's Health v. Paxton*, 10 F.4th 430 (5th Cir. 2021), a post-*Dobbs* Fourteenth Amendment decision, to suggest we use its facts to fill the State's evidentiary gap here.

We acknowledge the makeup of this court has changed since our last decision. But even a subsequent court's disagreement with an earlier court's reasoning or conclusion does not invoke by itself an exception to the doctrine. See *Cromwell v Simons,* 280 F. 663, 674, *cert. denied* 258 U.S. 630 (2d Cir. 1922) (changed makeup of court is not sufficient grounds for reversing earlier holdings in a case).

13

Finally, we note the State had the opportunity to request a rehearing or modification of our first decision and present its arguments at the time we issued the opinion, but it did not avail itself of that opportunity. See Supreme Court Rule 7.06 (2023 Kan. S. Ct. R. at 51) (procedure for motions for rehearing or modification). The State essentially makes such a request now, well beyond the 21-day limit set out in the rule, without any justification for ignoring the earlier opportunity. We will not entertain this untimely request now, especially considering the State's failure to assert any new authority indicating our ruling was clearly erroneous.

We stand by our conclusion that section 1 of the Kansas Constitution Bill of Rights protects a fundamental right to personal autonomy, which includes a pregnant person's right to terminate a pregnancy. The State must show any infringement of that right withstands strict scrutiny. *Hodes I*, 309 Kan. at 680 ("Under our strict scrutiny standard, the State is prohibited from restricting that right unless it can show it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest.").

*S.B. 95 violates section 1 of the Kansas Constitution Bill of Rights.*

When a party asserts state action violates the right to terminate a pregnancy under section 1 of the Kansas Constitution Bill of Rights, the burden lies with the plaintiff to show an impairment of the right. If the plaintiff makes this showing, the burden shifts to the government to prove the impairment furthers a compelling state interest and is narrowly tailored to furthering that interest. *Hodes I*, 309 Kan. at 671-72.

The State concedes S.B. 95 impairs the right to abortion. It also does not dispute the district court's detailed factual findings. But it claims S.B. 95 withstands constitutional scrutiny because it is narrowly tailored to further two compelling government interests. It describes those two compelling interests as:  "promoting respect

14

for, the value of, and the dignity of human life, born or unborn" and "regulation and protection of the medical profession and the medical care provided to Kansans."

The district court rejected the State's position in part. It agreed the State's interest in "promoting respect for the value and dignity of human life, born or unborn" was compelling. But it concluded S.B. 95 is not narrowly tailored to that interest. It further ruled the State failed to show it has a compelling interest in the regulation and protection of the medical profession and the medical care provided to Kansans.

Our well-settled standard governs review of a district court's grant of summary judgment.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo." *GFT Lenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

The parties agree there is no genuine issue of material fact in the record. They disagree about whether the uncontested material facts show S.B. 95 withstands strict scrutiny.

Our strict scrutiny inquiry requires the State prove three things:  (1) it has a compelling interest; (2) the challenged action actually furthers that interest; and (3) it

15

does so in a way that is narrowly tailored. *Hodes I*, 309 Kan. at 680; *Hodes & Nauser v. Stanek*, 318 Kan. __ (No. 125,051, this day decided), slip op. at 15.

The first prong requires the government show its asserted interest is compelling. In *Hodes I*, we described a compelling interest as "one that is 'not only extremely weighty, possibly urgent, but also rare—much rarer than merely legitimate interests and rarer too than important interests.'" *Hodes I*, 309 Kan. at 663. The Supreme Court has described a compelling interest as one "of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). In other words, "'[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation.'" *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963) (quoting *Thomas v. Collins*, 323 U.S. 516, 530, 65 S. Ct. 315, 89 L. Ed. 430 [1945]).

Interests are more likely to be legally compelling when they are concrete and exhibit some level of specificity, rather than broad and open to wide interpretation and inclusion of a great array of concerns. In *Stanek*, we acknowledged this. We concluded courts should avoid more generic statements of government interest that amount to little more than advancing a "commendable goal" because they make meaningful judicial review more elusive and provide "little, if any, guidance on how to determine whether an interest articulated by the State is a compelling one under the strict scrutiny framework." *Stanek*, 318 Kan. at __, slip op. at 27. We also questioned "whether an interest articulated in the abstract is enough to establish the compelling nature of that interest," and noted that "[r]equiring only a theoretical government interest creates the potential for arbitrary results." *Stanek,* 318 Kan. at __, slip op. at 30.

As one legal commentor has opined, "it will frequently be crucial how the government's interest is defined," in part because "the narrow tailoring inquiry will be left untethered if there is too little attention to exactly what the government's purportedly compelling interest is." Fallon, *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1325

16

(2007). As we discuss below, the narrow tailoring prong of strict scrutiny requires "'[p]recision of regulation.'" *State v. Ryce*, 303 Kan. 899, 956-57, 368 P.3d 342 (2016). It is undoubtedly difficult, if not impossible, to effectively regulate in the interest of something that is amorphous or capable of encompassing countless sub-interests.

If the government can establish an interest as compelling, it must tackle the second step in our analysis and show its regulation *furthers* that compelling interest See *Holt v. Hobbs*, 574 U.S. 352, 362-64, 135 S. Ct. 853, 190 L. Ed. 2d 747 (2015) (strict scrutiny requires government action "actually further[ed]" asserted interest); *Carey v. Population Servs., Intl.*, 431 U.S. 678, 690-91, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977) (legislation could not withstand strict scrutiny because it did not serve the State's asserted interests); Galloway, *Basic Substantive Due Process Analysis*, 26 U.S.F. L. Rev. 625, 640 (1992) ("The 'compelling interest' prong of strict scrutiny requires not only that the government have a compelling interest, but also that the government's conduct 'further' that interest, i.e., the conduct must be a substantially effective means for advancing that interest.").

Showing that its action furthers its asserted interest can be crucial to the government's success. In *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 627, 136 S. Ct. 2292, 195 L. Ed. 2d 665 (2016), *abrogated by Dobbs*, 597 U.S. 215, the government's failure to produce evidence showing that abortion legislation furthered an interest in "maternal health" was key to the Supreme Court's conclusion that the law was unjustified when compared to the burden it created on the right to abortion. There, the government argued that legislation requiring doctors to have admitting privileges to hospitals to provide abortions did not advance any interest in patient health when the evidence showed that abortion "'was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure.'" *Hellerstedt*, 579 U.S. at 610-11. Legislation requiring all abortion facilities to meet surgical-center standards also failed to further an interest in maternal health because the evidence made it clear that the requirement would not create "'better care or . . . more

17

frequent positive outcomes.'" *Hellerstedt*, 579 U.S. at 582. Although the Court in *Hellerstedt* was applying a form of the undue burden test, its evidence-based approach to the furtherance question provides an instructive tool for our application of the same question within the strict scrutiny test. See *Hodes I*, 309 Kan. at 701 (Biles, J., concurring) (opining that test in *Hellerstedt* captures strict scrutiny test described by majority).

The third prong of strict scrutiny requires the government action be narrowly tailored in its furtherance of the compelling interest. This requires "'[p]recision of regulation.'" *Ryce*, 303 Kan. at 957 (quoting *Natl. Assn. for Advancement of Colored People v. Button*, 371 U.S. 415, 438, 83 S. Ct. 328, 9 L. Ed. 2d 405 [1963]). Courts often break this analysis into one or more of three components.

The first component considers whether the action is necessary or, in other words, "the least restrictive alternative." See *Republican Party of Minn. v. White*, 536 U.S. 765, 775, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002) (to be narrowly tailored, a statute must not "unnecessarily circumscribe protected expression"); *Burson v. Freeman*, 504 U.S. 191, 199, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992) ("To survive strict scrutiny, however, a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest."); *Boos v. Barry*, 485 U.S. 312, 329, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988) (even if action serves government interest, it is not narrowly tailored if "a less restrictive alternative is readily available"); *United States v. Brandon*, 158 F.3d 947, 960 (6th Cir. 1998) (narrow tailoring requires government action be "least restrictive . . . means of satisfying" compelling interest); Fallon, 54 UCLA L. Rev. at 1326 ("The first element of the narrow tailoring requirement insists that infringements of protected rights must be necessary in order to be justified . . . [i.e.] the government's chosen means must be 'the least restrictive alternative' that would achieve its goals.").

The second component considers whether the action is underinclusive, meaning "it fails to regulate activities that pose substantially the same threats to the government's purportedly compelling interest as the conduct that the government prohibits." Fallon, 54 UCLA L. Rev. at 1327. Underinclusive regulations do not withstand strict scrutiny because they "'diminish the credibility of the government's rationale' for infringing on constitutional rights and generate suspicion that the selective targeting betrays an impermissible motive." Fallon, 54 UCLA L. Rev. at 1327 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 52, 114 S. Ct. 2038, 129 L. Ed. 2d 36 [1994]). See also *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) ("'a law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited'"); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448-49, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015) (explaining "underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint'" and "reveal that a law does not actually advance a compelling interest"); *Bishop v. Smith*, 760 F.3d 1070, 1081-82 (10th Cir. 2014) (ban on same-sex marriage not narrowly tailored because it is underinclusive; government contends ban serves interest in children being raised by biological parents but fails to address other contexts in which children will be raised by non-biological parents); *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 135 (Minn. 2014) (to be narrowly tailored, "a statute can be neither overinclusive nor underinclusive; rather, it must be 'precisely tailored to serve the compelling state interest'").

The third component considers whether the action is overinclusive, meaning it regulates activity that does not affect the government's asserted interest. Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny*, 144 U. Pa. L. Rev. 2417, 2422 (1996); see also *Citizens United v. Fed. Election Commonwealth*, 558 U.S. 310, 362, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) (statute prohibiting corporations from funding speech supporting political candidates was overinclusive in relation to

interest in preventing dissenting shareholders from being compelled to fund corporate speech because it applied to all corporations, including those with a single shareholder); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991) (law requiring person convicted of a crime to give income from any writings describing the crime to victims and creditors was overinclusive as means for ensuring victims are compensated from proceeds of crime because law applied to all works, even if description of the crime was tangential and because the definition of person convicted of a crime was broad enough to include any author who admitted to crime regardless of accusation or conviction); *Bishop*, 760 F.3d at 1082 (ban on same-sex marriage not narrowly tailored because it is overinclusive; ban goes well beyond serving interest in ensuring children raised by biological parent—it denies same-sex couples fundamental right to marry); *State v. Burnett*, 93 Ohio St. 3d 419, 429, 755 N.E.2d 857 (2001) ("'A statute is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy.'" [quoting *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)]).

Sometimes courts examine all three of the narrow tailoring components. See *Burson*, 504 U.S. at 206-07 (considering whether statute prohibiting solicitation of votes and campaign materials within 100 feet of polling place was necessary, overinclusive, or underinclusive); *Cahaly v. Larosa*, 796 F.3d 399, 405-06 (4th Cir. 2015) (considering all three components); *Welchen v. Bonta*, 630 F. Supp. 3d 1290 (E.D. Cal. 2022) (same). But courts often deem just one or two considerations to be fatal to the narrow tailoring analysis, leaving no reason for the court to consider the remaining components. See *Simon & Schuster, Inc.*, 502 U.S. at 121 (holding law was not narrowly tailored and thus unconstitutional because it was overinclusive); *Boos*, 485 U.S. at 329 (law is not narrowly tailored because "less restrictive alternative is readily available").

A robust argument from the government that its action or legislation is precisely tailored to furthering its interests will rely on actual evidence of such precision. This is

20

especially true in cases like this when the state is legislating within the medical field. See *Hodes I*, 309 Kan. at 701 (Biles, J., concurring) (noting "the pivotal role expert testimony typically plays in medically related litigation").

With this description of the strict scrutiny test in mind, we now apply its principles to the State's arguments.

*Even if S.B. 95 furthers a compelling interest in promoting the value and dignity of human life, born and unborn, the State has failed to show S.B. 95 is narrowly tailored toward that end.*

The State has argued S.B. 95 furthers a compelling interest in promoting the value and dignity of human life, born and unborn, and that it is narrowly tailored to that end. It offered no evidence to support its claims. Although it advanced one witness, it withdrew that witness after the Providers deposed them. The Providers offered expert and fact declarations under oath from three witnesses, but the State deposed none of them.

In place of evidence, the State made legal arguments and offered its own opinion on the morality of a D & E. It asserted it has a compelling interest in promoting the value and dignity of all human life, born and unborn, because it has such an interest in a person who has been born, and in Kansas, a fetus is synonymous with a person who has been born. It relied on K.S.A. 65-6732, often referred to as the "personhood statute" to equate a fetus with a person who has been born. This statute provides that "the life of each human being begins at fertilization" and requires Kansas laws to "be interpreted and construed to acknowledge on behalf of the unborn child . . . all the rights, privileges and immunities available to other persons, citizens and residents of this state" subject to the federal and Kansas Constitutions. K.S.A. 65-6732(a), (b). The State argued S.B. 95 furthers its interest in promoting the value and dignity of human life because it prohibits a "grotesque, demeaning, dehumanizing procedure." It claimed the legislation is narrowly

21

tailored toward that end because it allows for other methods of second-trimester abortion, includes exceptions for preserving the pregnant patient's life and for preventing irreversible impairment to major bodily functions, and limits who is liable under the statute.

But given the lack of any new evidence from the State and the extensive analysis of our earlier decision, the district judge aptly questioned the State during a hearing on the summary judgment motions what it thought was "left for the district court here to do?" The State responded:

> "Given the failure of our expert witness and our inability to—our failure to present additional evidence through an expert who remains up for consideration here, I—I would agree that the State has not put forward any additional evidence as the remand from the court—the Supreme Court. . . . [T]he one thing I think that's left before this Court to analyze that didn't really get treatment in the Supreme Court opinion is to recognize, and this would be contrary to the discussions in Judge Atcheson's opinion, but to recognize the dignity and—and value of life that the unborn has under Kansas law and the significance of that—that personhood and that dignity when evaluating the constitutionality of abortion regulation and expanding the legal conversation beyond just maternal autonomy."

The court then asked the State to "say that was something that this Court wanted to do. In the legal analysis, and given the record before the Court, then what?" The State answered:

> "Well I—I can offer Judge is on the inevitable appeal of any such order recognizing that compelling state interests, the Appellate Courts would have the opportunity to evaluate whether that sits properly with their interpretation of *Hodes*. I recognize that we don't have a witness to question further presented by the defense to further embellish that in a trial setting and that the—the record before the Court of

22

Appeals would be only expanded from its initial look by the arguments made in the briefs themselves."

The district court accepted half of the State's arguments. It agreed S.B. 95 furthers a compelling interest in promoting respect for the value and dignity of human life, born and unborn. But it ruled S.B. 95 is not narrowly tailored to furthering that interest.

We take a different route to the same end. We will not decide today whether the district court was correct to sanction this interest as compelling and to conclude S.B. 95 furthers it. We take this route because of two aspects of the record before us which prevent a thorough review of an issue that has potentially far-reaching precedential effect.

First, the interest articulated by the State is a broadly stated aspirational interest that has many nuances and facets reaching beyond D & E's and second-trimester abortion. Yet the State has painted with a broad brush and relied almost exclusively on K.S.A. 65-6732. The State insists its interest is compelling because the people of Kansas have "openly expressed" through their elected representatives the notion that life begins at fertilization. But that argument runs face first into the August 2022 vote of the people overwhelmingly rejecting a proposed constitutional amendment to give those same elected representatives unfettered regulatory control over abortion.

Considerable authority suggests the State cannot create a compelling interest through legislation. See *Hodes*, 52 Kan. App. 2d at 311 (Atcheson, J., concurring) (a "statute cannot . . . alter the constitutional rights secured in [section] 1 [because] the legislature cannot mandate how the courts construe constitutional protections"); *Gryczan v. State*, 283 Mont. 433, 454, 942 P.2d 112 (1997) ("[T]he courts are [not] bound to simply acquiesce" when the "legislature has enacted as law what may be a moral choice of the majority" because the "Constitution guarantee[s] to all persons, whether in the majority or in a minority, those certain basic freedoms and rights which are set forth in

23

the Declaration of Rights."). And courts must guard their role in the separation of powers that distinguish our form of government. *Harris v. Shanahan*, 192 Kan. 183, 207, 387 P.2d 771 (1963) ("this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas").

Moreover, the State's interest, as stated, is so generic as to mean anything the State wants it to mean when it needs to justify anything it would want to do. And that does not protect the fundamental right of bodily autonomy, or for that matter any other fundamental right. For example, this phrasing could justify government force to compel someone to donate a body organ if doing so would save a life. Or it could return us to the days of R.S. 1923, 76-149 through 76-155, authorizing in Kansas sterilization of the "insane," epileptic, or "feeble-minded" as justified by "the interests of the higher general welfare"); cf. L. 1965, ch. 477, § 1 (repealing R.S. 1923, 76-149).

Second, the State has not presented even a scintilla of evidence that S.B. 95 *furthers* the stated interest. We have made clear that in ascertaining whether an action "directly promotes valid state interests . . . findings must be based on evidence, including medical evidence, presented in judicial proceedings. Mere deference to legislative or administrative findings or stated goals would be insufficient." *Hodes I*, 309 Kan. at 700 (Biles, J., concurring); see also *Hellerstedt*, 579 U.S. at 610 (legislation did not further an interest in patient health when the State failed to provide evidence showing there "was no significant health-related problem that the new law helped to cure").

Nevertheless, we decline to address this undeveloped point because we can affirm the district court on the basis of its holding that S.B. 95 is not narrowly tailored to its asserted end. See *Stanek*, 318 Kan. at __, slip op. at 30 (assuming without deciding that protecting maternal health may be a compelling state interest since the district court made no factual findings about the state's compelling interest as to that interest). In sum, we assume without deciding that the State's asserted interest in promoting respect for the

24

value and dignity of all human life, born and unborn, is compelling and that S.B. 95 furthers that interest. We move to the third prong of our strict scrutiny test.

A single component of the narrow tailoring inquiry illustrates the State's failure to carry its burden. The record created by the parties clearly indicates S.B. 95 is underinclusive.

The State argues S.B. 95 is narrowly tailored because it prohibits an undignified manner of abortion while leaving other abortion procedures available, creates exceptions for life and health, and limits who is liable for a violation. But the State offered nothing to demonstrate D & E is distinguishable from those other forms of abortion. Thus, based on the record we have, S.B. 95 "fails to regulate activities that pose substantially the same threats to the government's purportedly compelling interest." *Fallon,* 54 UCLA L. Rev. at 1327.

The State claims the D & E is "particularly barbaric" and "particularly offensive to the value and dignity of human life" compared to other forms of abortion. Not only did the State fail to produce evidence in support of this assertion, but it also failed to counter the Providers' evidence to the contrary.

The State advanced four alternatives to the D & E: labor induction and delivery, inducing fetal demise prior to a D & E through digoxin injection, inducing fetal demise prior to the D & E through KCl injection, and inducing fetal demise prior to a D & E through umbilical cord transection. The district court found from the plaintiffs' facts that hysterotomy is another possible second-trimester abortion technique.

To complete labor induction and delivery, physicians use medication to induce labor and the pregnant patient vaginally delivers the fetus in a hospital setting over the

25

course of anywhere from five hours to three days. A hysterotomy "entails an incision through the woman's abdomen and uterus."

To achieve fetal demise prior to a D & E through digoxin injection, physicians use a spinal needle to inject digoxin through the patient's abdomen, vagina, or cervix, into either the amniotic fluid or the fetus. It can take up to 24 hours for digoxin to cause demise, and it is not 100% effective, thus sometimes requiring a second injection.

To achieve fetal demise prior to a D & E through KCl injection, physicians administer the injection via needle through the pregnant patient's abdomen, cervix, or vagina, into the fetal heart.

And to achieve fetal demise prior to a D & E through umbilical cord transection, physicians break the amniotic sac, remove the amniotic fluid, locate the umbilical cord, and transect the cord.

The State claims each of its suggested methods is more dignified than the D & E, but no evidence supports this. The Providers' expert in biomedical ethics noted there is no agreement on human dignity in health care generally or regarding the "termination of a fetus prior to viability." He described the State's "position that certain methods of inducing fetal demise are more dignified than standard D & E" as "baseless."

Another of the Providers' experts explained that in one study, 81% of patients who were offered the option to induce fetal demise by digoxin injection prior to a D & E declined. She stated other studies indicate when some patients "expressed such a preference, those studies were limited to instances in which women had no alternative but to undergo a demise procedure . . . and many women had incorrect perceptions about the procedure, including that the injection would make the abortion easier and less painful for them." The doctor noted that in her own experience, "once patients understand the risks

26

and details of the induced demise procedure, the large majority of women express a strong desire to avoid a demise procedure." The expert also stated, "There is no medical basis to suggest that it is more dignified to induce fetal demise prior to performing a D & E."

While the State claims the D & E is more offensive than other abortion procedures, it offered nothing to support this view or to counter the Providers' evidence indicating that no method of abortion is more dignified than another. Consequently, S.B. 95 is underinclusive because it fails to curtail activity that poses the same threat to the State's asserted interest as does the D & E.

The district court utilized similar reasoning. It held that S.B. 95 is not narrowly tailored because, even if the D & E is undignified, "so is death by induced labor or caesarean section prior to viability, cutting the umbilical cord, or injecting lethal chemicals into the womb or into the heart of the unborn child." The court reasoned: "Defendants offer no facts and little argument about how these alternatives for bringing death promote greater respect for the value and dignity of human life as a substitute for D & E; instead, they offer only a theory."

The State calls this result "puzzling," arguing that "the objection seems to be that the Act is *too* narrowly tailored and that it would need to prohibit a broader range of abortion procedures to be constitutional." But the State misses the point of the underinclusivity consideration. Prior to joining the Supreme Court, Justice Kagan explained, in the context of considering whether regulations on speech are narrowly tailored, "if a restriction applies to less speech than implicates the asserted interest . . . the concern grows that the interest asserted is a pretext." Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 453-54 (1996). In other words, the underinclusivity is not what is constitutionally offensive. Underinclusivity *reveals* something constitutionally offensive:

27

that the true interest animating the government's action is likely illegitimate. See *Shapiro v. Thompson*, 394 U.S. 618, 631, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), ("If a law has 'no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.'") *overruled for other reasons by Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); Spece & Yokum, *Scrutinizing Strict Scrutiny*, 40 Vt. L. Rev. 285, 299 (2015) ("Interests are illegitimate if they are patently prohibited by the Constitution, as with a mere desire to deter the exercise of a fundamental right.").

The State offered nothing in support of its position that S.B. 95 actually targets the harm it alleges. It has thus failed to carry its burden to show S.B. 95 is narrowly tailored to further any compelling interest in promoting respect of the value and dignity of human life, born and unborn. See *Doe v. City of Albuquerque*, 667 F.3d 1111, 1134 (10th Cir. 2012) (municipality's failure to produce any evidence that action inhibiting free speech was narrowly tailored to its asserted interest meant summary judgment for plaintiffs was appropriate).

We will now consider the State's second asserted interest to decide whether S.B. 95 withstands strict scrutiny.

*The State failed to show S.B. 95 furthers any interest in the regulation and protection of the medical profession and the medical care provided to Kansans.*

The State argued in the district court that S.B. 95 also furthers a compelling interest in "the regulation and protection of the medical profession and the medical care provided to Kansans" and that it is narrowly tailored toward that end. The district court concluded the State failed to show this is a compelling interest. It observed that other courts have held that regulating and protecting the medical profession is a legitimate

interest. But it ruled the State failed to present any evidence or authority this interest is compelling.

Again, the State has advanced a broad interest capable of encompassing a wide range of goals and concerns. Throughout its briefing and arguments, it characterizes this interest as protecting a fetus from the medical community, protecting pregnant patients from the medical community, and protecting the integrity of the medical community. The State's failure to advance a specific and concrete interest alone suggests to us the district court was correct when it ruled the State failed to prove this interest is compelling. But, again, we need not wade into the depths of that discussion because the State's abject failure to produce any evidence supporting its position results in a clear failure to show S.B. 95 furthers any interest in protecting the integrity of the medical profession or in patient safety. See *Cornelio v. Connecticut*, 32 F.4th 160, 173 (2d Cir. 2022) (Government's failure to produce any evidence resulted in failure to show that action abridging free speech materially advanced asserted interests so district court's dismissal of plaintiff's claim was error.).

As the district court found and the State did not contest, S.B. 95 eliminates a safe and common medical procedure and leaves patients subject to procedures that are rarely used, are untested, and are sometimes more dangerous or impossible. The district court's findings in support of this general assessment were numerous. For example, regarding labor induction and delivery, the court found:

> "[I]nduced labor abortions must be performed on an inpatient basis in a hospital, can take up to 2 to 3 days, and are more expensive than outpatient D & E. . . . [A] prolonged induction poses an increased risk of infection compared with D & E. Although serious complications are rare, complications occur more often in inductions than in D & E procedures. . . . [I]nduction requires women to go through labor, offers less predictable timing, and may fail or cause uterine rupture. Following an induction, between 10 to 33%

29

of women have retained placenta and must undergo an additional medical procedure to have it removed."

Regarding the State's suggestion that doctors could induce fetal demise through digoxin or KCl injection prior to a D & E, the court found:

"There is virtually no research on the use of digoxin to induce fetal demise prior to 18 weeks. . . . Research to date on the administration of digoxin to induce fetal demise prior to a D & E finds no clear medical benefit, but has shown increased risks of infection, vomiting, unplanned fetal delivery outside a medical facility, and hospitalization. Though rare, digoxin toxicity poses an extreme risk, with documented incidence of hyperkalemic paralysis, which can be fatal. Some women also have contraindications for digoxin injections, and digoxin injections are less likely to be successful on obese women or women with uterine fibroids, both of which are common. . . . [I]njections prior to 18 weeks would likely have even higher failure rates, and it may be technically impossible to do an intrafetal injection. . . . [I]f fetal demise does not occur in the expected time period after the first digoxin injection, a second injection would be necessary to induce fetal demise. Dr. Davis and Dr. Nauser were not aware of any published information showing that multiple doses of digoxin to induce demise is either safe or effective. Dr. Davis opined that requiring physicians to perform a digoxin injection prior to 18 weeks or to provide a second injection, and delay the procedure even further, is untested and confers even greater risk. . . . It is Dr. Nauser's medical judgment that, as to induction of demise using digoxin prior to 18 weeks in particular, and given the lack of study on the topic, performing such procedures amounts to experimenting on patients.

"[Inducing fetal demise through KCl injection] requires a high level of skill and is typically performed by Maternal-Fetal Medicine OB-GYNs in a hospital setting using ultrasound guidance, following a specialized fellowship to gain advanced training and extensive practice. Training to perform KCl injections is not part of obstetrics and gynecology residency training, and it is not part of the training program of family planning fellowships. KCl carries risks, including maternal cardiac arrest and infection. It can also be even more technically challenging or impossible in women with obesity or

30

uterine fibroids. There are no studies on the failure or complication rate of KCl injection performed by physicians without specialized training or in outpatient settings."

And regarding the State's position that doctors could transect the umbilical cord to achieve fetal demise before a D & E, the district court found

"there is no established medical benefit from performing umbilical cord transection. . . . Dr. Davis said it is likely that attempting this procedure would carry risks of pain, uterine perforation, infection, and bleeding. This method is not 100% reliable. Dr. Davis said transecting the cord prior to D & E to induce fetal demise cannot be accomplished in every case. . . . Because attempting to transect the umbilical cord necessarily entails breaking the amniotic sac and draining the amniotic fluid, a provider would be compelled to either proceed with performing the D & E procedure, or delay performing the D & E to attempt another method of inducing demise, which would expose the patient to heightened risk of serious complications such as pain, uterine perforation, infection and hemorrhage. Dr. Nauser said that attempting to induce demise using another method such as digoxin injection after the failure of umbilical cord transection is not the subject of any study."

In short, S.B. 95 does not further patient safety, it compromises patient safety.

The State acknowledges the evidence supporting this conclusion. In response, the State urged us at oral argument to look outside of the factual record in this case to a factual record in another case from a different *jurisdiction, Paxton*, 10 F.4th 430, that the State claimed has a fact pattern more favorable to its position. We are bewildered by this request and will not entertain it. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013) ("It is well-settled that the burden is on a party to designate a record sufficient to present its points to the appellate court and to establish its claims. . . . When facts are necessary to an argument, the record must supply those facts . . . .").

31

The State also insists S.B. 95 serves an interest in maintaining the integrity of the medical profession by ensuring "the perception of the practice of medicine in Kansas as one that is life-affirming, not grotesque" through a ban on a procedure "the State sees . . . as unnecessarily brutal and inhumane."

But the State has not established S.B. 95 is inconsistent with medical ethics. In fact, the factual record reveals the opposite. The Providers' experts attested that S.B. 95 harms the integrity of the medical profession because it prohibits doctors from offering a safe and common method of abortion with no patient benefit and will force physicians to administer more dangerous procedures.

Dr. Davis explained, "D & E is extremely safe. Major complication occurs in less than 1% of D & E cases." She noted "D & E can be performed on an outpatient, ambulatory basis in a clinic setting at a lower cost than any other second-trimester procedure performed after approximately 15 weeks gestation." "Because of its impressive safety record and its availability in an outpatient setting," Dr. Davis explained, "D & E remains a standard method, and is the most commonly used method for abortion after approximately 14-15 weeks." Dr. Nauser explained why prohibiting the D & E conflicts with medical ethics:

> "Forcing women to undergo procedures with greater costs, harms, and risks, and which in many instances are still experimental, is inconsistent with medical ethics. Rather than serving the integrity or wellbeing of the profession, the Act requires patients to undergo an invasive, unnecessary procedure that is inconsistent with the advice of their physician, or be prevented from accessing abortion entirely."

The district court made factual findings along these lines:

32

"Cunningham opined, and Dr. Nauser agreed, that under fundamental principles of medical ethics, physicians should not require patients to undergo medically unnecessary procedures in order to obtain other care.

"Cunningham opined, and Dr. Nauser and Dr. Davis agreed, that under these principles, women seeking D & E procedures prior to 18 weeks should not be subjected to an untested and unstudied procedure.

"Cunningham opined, and Dr. Nauser agreed, that the Act denies Dr. Nauser's patients the autonomy to freely choose among medically appropriate treatment options and will undermine the physician-patient relationship by forcing Dr. Nauser to comply with a government mandate that she does not believe is in her patients' best interests."

The State acknowledges "[o]thers can disagree" with its opinion that a ban on D & E eliminates a procedure that is "brutal and inhumane," thereby furthering an interest in maintaining the integrity of the medical profession. It argues what matters is that "it has deemed" the D & E so.

We disagree. The State may have an opinion, but what matters is the evidence. And the Providers' evidence showed S.B. 95 may cause a patient to "lose faith in the medical profession when she discovers that she will be denied a procedure (D & E), or subjected to additional procedures (fetal-demise procedures), for no medical reason whatsoever but rather for reasons of pure paternalism." *Bernard v. Individual Members of Ind. Med. Licensing Bd.*, 392 F. Supp. 3d 935, 958-59 (S.D. Ind. 2019) (holding a ban on D & E does not further an interest in protecting the integrity of the medical profession), *vacated in accordance with Dobbs*, 597 U.S. 215. The State has failed to show S.B. 95 furthers any interest in the medical care provided to Kansans or the integrity of the medical profession.

CONCLUSION

The State has not carried its burden to establish S.B. 95 is narrowly tailored to furthering any compelling interest. We affirm the district court's grant of summary judgment for the Providers. We strike K.S.A. 65-6741 et seq., as argued before the district court, as an unconstitutional violation of section 1 of the Kansas Constitution Bill of Rights.

WALL, J., not participating.

* * *

WILSON, J., concurring: I concur in the judgment.

The text of section 1 of the Kansas Constitution Bill of Rights states: "All men are possessed of equal and inalienable natural rights, *among which* are life, liberty, and the pursuit of happiness." (Emphasis added.) In my view, the text's inclusion of the phrase "among which" makes clear in plain language that all people have natural rights *beyond* the rights to life, liberty, and the pursuit of happiness.

During oral arguments before this court, the State agreed that bodily autonomy is an inalienable natural right. The decision to have an abortion certainly implicates a pregnant woman's bodily autonomy.

All abortions terminate a woman's pregnancy. To be specific, S.B. 95 only limits the *method* by which an otherwise legal abortion may be effected. Plaintiffs allege this limit imposes an unconstitutional restriction on the woman's natural, section 1, constitutional rights. The State suggests otherwise. The majority and the dissent use

34

different approaches to determine whether S.B. 95 violates the Kansas Constitution, with the majority concluding S.B. 95 unconstitutionally violates the woman's natural right.

The State also agrees the question of whether the Kansas Constitution defines a fetus, or unborn child, as a person is not before us in this case. The instant controversy therefore involves when and how the government may infringe on the exercise of a woman's natural right to bodily autonomy, rather than the question of how that bodily autonomy right may conflict with natural rights held by others.

I write separately because I believe S.B. 95 is unconstitutional, though for a different reason than the majority. In my view, this purported law is unconstitutionally vague, leaving a doctor vulnerable to criminal culpability, while providing dubious notice and insufficient explanation to the doctor of what conduct is criminalized. Thus, prosecutors and juries determine retroactively when and how S.B. 95's rules are violated.

I acknowledge this issue was not briefed by the parties, but I write separately because the constitutionality of S.B. 95 is before us, and the principle of judicial economy compels me to highlight what I consider to be a fatal constitutional infirmity with S.B. 95. See *James v. United States*, 550 U.S. 192, 230, 127 S. Ct. 1586, 167 L. Ed. 2d 532 (2007) (Scalia, J., dissenting) (suggesting the Armed Career Criminal Act's residual clause was unconstitutionally vague even though neither James nor his amici pressed the issue); *Com. v. Berryman*, 437 Pa. Super. 258, 297 n.10, 649 A.2d 961 (1994) (Cirillo, J., dissenting) (raising vagueness sua sponte because "the appellee has challenged, in general, the constitutionality of the statute, and, more importantly, in order to avoid substantial injustice, I find it necessary to address this argument"); *Ramirez v. State*, 104 S.W.3d 549, 551-52 (Tex. Crim. App. 2003) (Womack, J., concurring) (concurring in the judgment affirming the district court but for a different reason than the majority); Anderson, *Right for Any Reason*, 44 Cardozo L. Rev. 1015, 1042 (2023) ("Not only does affirmance on alternative grounds promote judicial economy in the particular

35

case by avoiding waste of resources where the outcome is certain, but it also promotes judicial economy on a larger scale by reducing the number of successful appeals and therefore reducing congestion of court dockets.").

> "Whether a statute is constitutional is a question of law subject to unlimited review. This court presumes that statutes are constitutional and resolves all doubts in favor of passing constitutional muster. If there is any reasonable way to construe a statute as constitutionally valid, this court has both the authority and duty to engage in such a construction. [Citations omitted.]" *In re A.B.*, 313 Kan. 135, 138, 484 P.3d 226 (2021) (quoting *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 [2015]).

S.B. 95 is contained in K.S.A. 65-6741 to K.S.A. 65-6749. K.S.A. 65-6743(a) prohibits "dismemberment abortion" and sets forth exceptions to the prohibition; K.S.A. 65-6742 gives pertinent definitions; K.S.A. 65-6745 sets forth the civil cause of action against doctors and others who violate K.S.A. 65-6743; and K.S.A. 65-6746 sets forth the criminal action against doctors and others who violate K.S.A. 65-6743.

K.S.A. 65-6743(a) states:

> "(a) No person shall perform, or attempt to perform, a dismemberment abortion on an unborn child unless: (1) The dismemberment abortion is necessary to preserve the life of the pregnant woman; or (2) a continuation of the pregnancy will cause a substantial and irreversible physical impairment of a major bodily function of the pregnant woman. No condition shall be deemed to exist if it is based on a claim or diagnosis that the woman will engage in conduct that would result in her death or in substantial and irreversible physical impairment of a major bodily function."

K.S.A. 65-6742 states:

> "As used in K.S.A. 65-6741 through 65-6749, and amendments thereto:

36

"(a) 'Abortion' means the use or prescription of any instrument, medicine, drug or any other substance or device to terminate the pregnancy of a woman known to be pregnant with an intention other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead unborn child who died as the result of natural causes in utero, accidental trauma or a criminal assault on the pregnant woman or her unborn child, and which causes the premature termination of the pregnancy.

"(b)(1) 'Dismemberment abortion' means, with the purpose of causing the death of an unborn child, knowingly dismembering a living unborn child and extracting such unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors or similar instruments that, through the convergence of two rigid levers, slice, crush or grasp a portion of the unborn child's body in order to cut or rip it off.

(2) The term 'dismemberment abortion' does not include an abortion which uses suction to dismember the body of the unborn child by sucking fetal parts into a collection container, although it does include an abortion in which a dismemberment abortion, as defined in subsection (b)(1), is used to cause the death of an unborn child but suction is subsequently used to extract fetal parts after the death of the unborn child.

"(c) 'Knowingly' shall have the same meaning attributed to such term in K.S.A. 21-5202, and amendments thereto.

"(d) 'Medical emergency' means a condition that, in reasonable medical judgment, so complicates the medical condition of the pregnant woman as to necessitate the immediate abortion of her pregnancy to avert the death of the woman or for which a delay necessary to comply with the applicable statutory requirements will create serious risk of substantial and irreversible physical impairment of a major bodily function. No condition shall be deemed a medical emergency if based on a claim or diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible physical impairment of a major bodily function."

37

K.S.A. 65-6745 states:

"(a) A cause of action for civil damages against a person who has performed a dismemberment abortion in violation of K.S.A. 65-6743, and amendments thereto, may be maintained by the following persons, unless, in a case where the plaintiff is not the woman upon whom the abortion was performed, the pregnancy resulted from the plaintiff's criminal conduct:

(1) A woman upon whom a dismemberment abortion has been performed in violation of K.S.A. 65-6743, and amendments thereto;

(2) the father of the unborn child, if married to the woman at the time the dismemberment abortion was performed; or

(3) the parents or custodial guardians of the woman, if the woman has not attained the age of 18 years at the time of the abortion or has died as a result of the abortion."

K.S.A. 65-6746 states:

"Upon a first conviction of a violation of K.S.A. 65-6743, and amendments thereto, a person shall be guilty of a class A person misdemeanor. Upon a second or subsequent conviction of a violation of K.S.A. 65-6743, and amendments thereto, a person shall be guilty of a severity level 10, person felony."

Kansas courts recognize two types of vagueness challenges: facial and as applied. A facial challenge requires the challenger to "establish that no set of circumstances exists under which the Act would be valid." *State v. Jones*, 313 Kan. 917, 931, 492 P.3d 433 (2021) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 [1987]). It is "an attack on a statute itself as opposed to a particular application." *Los Angeles v. Patel*, 576 U.S. 409, 415, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015). On the other hand, an as applied challenge focuses on the statute's constitutionality as applied to a particular factual scenario. See *State v. Harris,* 311 Kan. 816, 829, 467 P.3d 504

(2020) (Biles, J., dissenting) ("This analysis is untethered from the circumstances of Harris' case and that has not been the way we have previously assessed similar vagueness challenges. We have looked instead to the particular facts of the case, but not other circumstances born from the imagination.").

Though the parties have not given us a vagueness analysis, it is my view that S.B. 95 cannot withstand scrutiny under *either* type of challenge. I do not believe any set of factual circumstances would render S.B. 95 constitutional.

In *Harris*, we outlined the two hurdles a statute must clear to rebut concerns of vagueness. 311 Kan. at 821. First, does the statute's language "fairly put people on notice as to the conduct proscribed? Are the words used common and understandable enough to allow persons of ordinary intelligence to easily grasp their meaning?" *Harris*, 311 Kan. at 822. This notice requirement arises from "the due process requirements of the Fourteenth Amendment." 311 Kan. at 821.

Second, does the statute "'provide explicit standards for those who apply them' . . . [so it will not] amount to an 'impermissibl[e] delegat[ion]' of 'basic policy matters' by the legislative branch to 'policemen, judges, and juries for resolution on an ad hoc and subjective basis'"? *Harris*, 311 Kan. at 821 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 33 L. Ed. 2d 222 [1972]). This concern is rooted in the separation of powers doctrine. 311 Kan. at 821.

Regarding the first vagueness hurdle of notice, the abortion procedure prohibited is called a "dismemberment abortion." Though the purpose of all abortion procedures is to cause the termination and removal of a fetus, the purpose of the abortion procedure prohibited in S.B. 95 is essentially a subset of that general aim. Here, the purpose is to cause the termination through the "knowing" separation, or *dis*memberment, of one

39

"member" of the fetus from another "member" and removal of "fetal parts." The "dismemberment" of "fetal parts" must be done with a levered instrument.

There are exceptions to the above-described prohibition. They are: (1) the "dismemberment" procedure is necessary to preserve the mother's life, or (2) "a continuation of the pregnancy will cause a substantial and irreversible physical impairment of a major bodily function of the pregnant woman." K.S.A. 65-6743(a). But these exceptions fail to clearly notify physicians of their applicability. S.B. 95 does not define "necessary" or "substantial." More, whether a major bodily function is "irreversibly" impaired is a fact, rather than subjective or objective opinion, but that fact may not be obvious at the time of the procedure. The statute, therefore, fails to notify a physician about *when* an exception arises. See *State v. Norris*, 226 Kan. 90, 93, 595 P.3d 1110 (1979) ("This conduct prohibited by the statute is not vague or indefinite. The appellant should have had no trouble in understanding what conduct on his part was prohibited.").

Setting aside the first prong of our vagueness test—notice—S.B. 95 runs afoul of the second, and "more important," concern. *Harris*, 311 Kan. at 822 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 [1983]). That concern is arbitrary enforcement. To illustrate, it is worth comparing other Kansas statutes governing abortion or abortion methods.

First, K.S.A. 65-6703(a), the statute proscribing abortion after viability, provides:

> "No person shall perform or induce, or attempt to perform or induce an abortion when the unborn child is viable unless such person is a physician and has a documented referral from another physician not legally or financially affiliated with the physician performing or inducing, or attempting to perform or induce the abortion and both physicians provide a written determination, *based upon a medical judgment arrived at using and exercising that degree of care, skill and proficiency commonly exercised by the*

*ordinary skillful, careful and prudent physician in the same or similar circumstances and that would be made by a reasonably prudent physician, knowledgeable in the field, and knowledgeable about the case and the treatment possibilities with respect to the conditions involved*, that: (1) The abortion is necessary to preserve the life of the pregnant woman; or (2) a continuation of the pregnancy will cause a substantial and irreversible physical impairment of a major bodily function of the pregnant woman. No condition shall be deemed to exist if it is based on a claim or diagnosis that the woman will engage in conduct that would result in her death or in substantial and irreversible physical impairment of a major bodily function." (Emphasis added.)

Second, K.S.A. 65-6724(a), the statute prohibiting abortion after the fetus is "pain-capable" (meaning the gestational age of 22 weeks or more [K.S.A. 65-6723]), provides:

"No person shall perform or induce, or attempt to perform or induce an abortion upon a pain-capable unborn child unless such person is a physician and has a documented referral from another physician not legally or financially affiliated with the physician performing or inducing, or attempting to perform or induce the abortion and both physicians provide a written determination, *based upon a medical judgment arrived at using and exercising that degree of care, skill and proficiency commonly exercised by the ordinary skillful, careful and prudent physician in the same or similar circumstances and that would be made by a reasonably prudent physician, knowledgeable in the field, and knowledgeable about the case and the treatment possibilities with respect to the conditions involved*, that: (1) The abortion is necessary to preserve the life of the pregnant woman; or (2) a continuation of the pregnancy will cause a substantial and irreversible physical impairment of a major bodily function of the pregnant woman. No such condition shall be deemed to exist if it is based on a claim or diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible physical impairment of a major bodily function." (Emphasis added.)

Third, K.S.A. 65-6721(a), the statute proscribing partial birth abortions, provides:

"No person shall perform or induce a partial birth abortion on an unborn child unless such person is a physician and has a documented referral from another physician

41

who is licensed to practice in this state, and who is not legally or financially affiliated with the physician performing or inducing the abortion and *both physicians provide a written determination, based upon a medical judgment that would be made by a reasonably prudent physician, knowledgeable in the field and knowledgeable about the case and the treatment possibilities with respect to the conditions involved*, that the partial birth abortion is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." (Emphasis added.)

These three statutes contain exceptions to abortion prohibitions. Each includes language indicating that the medical judgment of a reasonably prudent physician is at least one factor in determining whether an exception is met. This additional context is wholly absent from S.B. 95. Again, S.B. 95 provides:

"(a) No person shall perform, or attempt to perform, a dismemberment abortion on an unborn child unless: (1) The dismemberment abortion is necessary to preserve the life of the pregnant woman; or (2) a continuation of the pregnancy will cause a substantial and irreversible physical impairment of a major bodily function of the pregnant woman. No condition shall be deemed to exist if it is based on a claim or diagnosis that the woman will engage in conduct that would result in her death or in substantial and irreversible physical impairment of a major bodily function." K.S.A. 65-6743(a).

Who, then, determines when an exception to the prohibition exists and the "dismemberment" procedure may be performed? And what are the principles guiding that determination? S.B. 95 defines "medical emergency," which includes a consideration of "reasonable medical judgment," but the term "medical emergency" is not found as an exception to the procedure's prohibition or anywhere in the remainder of S.B. 95's statutes. S.B. 95's exceptions to the basic prohibition of the "dismemberment" procedure are silent concerning any reference to either an objective or subjective consideration of the physician's training and experience.

42

Generally, abortion surgeries are performed by a physician, who must have a certain level of education, skill, and expertise. Things can go awry during any surgery. What if something goes wrong during an abortion operation—such as unforeseen bleeding, a drop in blood pressure, unexpected pain, sudden unconsciousness—and the doctor determines a surgical procedure that may involve separation of fetal "members" of a living fetus is necessary to save the life of the mother?

Under the plain language of S.B. 95, it is unclear if the physician's medical opinion on the matter is sufficient to allow her to perform the procedure she deems necessary without risk of civil liability or criminal culpability. The statute provides no standard for the physician to ascertain legal versus illegal action before she takes that action. See, e.g., *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979) (finding a section of a Pennsylvania abortion act that requires the physician to determine whether a fetus is viable vague because it was unclear whether the statutory language imposed an objective standard or a mixed subjective and objective standard), *abrogated on other grounds by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022); *Smith v. Goguen*, 415 U.S. 566, 578, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974) ("This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause."); *Karlin v. Foust*, 188 F.3d 446, 466 (7th Cir. 1999) ("Just as AB 441's 'reasonable medical judgment' standard clearly provides the standard to which physicians must conform their conduct, that same standard provides the guideline pursuant to which prosecutors, state licensing authorities, and civil plaintiffs can seek to hold physicians liable for erroneous emergency medical determinations."); *Planned Parenthood Great Northwest v. State*, 171 Idaho 374, 445-50, 522 P.3d 1132 (2023) (rejecting an argument that an abortion statute's "medical emergency" exception was vague and open to arbitrary enforcement when the exception included the objective standard "in reasonable medical judgment," and also rejecting a similar argument related to the affirmative defense of saving the mother's life

43

because the affirmative defense included the subjective standard of the physician's "good faith medical judgment" that was "based on the facts known to the physician at the time").

Instead, the physician will be vulnerable to the retroactive analysis of prosecutors and juries who may conclude the procedure was not necessary based on a standard other than reasonable medical judgment and the physician's good faith assessment, or even not necessary based on their own personal convictions. Put simply, the physician has no idea how her actions will be judged. Despite the possibility that ill-advised inaction or insufficient action may lead to negative consequences for her woman patient, the physician may be hesitant to act as she believes she should if, by doing so, she risks civil or criminal liability for herself under the restrictions of S.B. 95. See *Harris*, 311 Kan. at 823 ("Whether or not a person is arrested, charged, and convicted for violating a law must depend more on objective and discernable legal rules than on the mere discretion, guesswork, or whim of government officials."). Ironically, the physician's hesitation to violate S.B. 95 may then expose her to medical malpractice tort liability.

Because S.B. 95 does not put the standard for appropriate action within the operating physician's reasonable medical judgment, or even announce *any* standard for determining when its rules are violated, the Legislature, through S.B. 95, impermissibly transfers determination of the physician's civil and criminal liability to prosecutors, judges, and juries. See *Sessions v. Dimaya*, 584 U.S. 148, 182, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018) (Gorsuch, J., concurring) ("Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions."); *State v. Ingham*, 308 Kan. 1466, 1483, 430 P.3d 931 (2018) (Stegall, J., concurring) ("Vague laws give police officers, prosecutors, judges, and juries the authority to decide what the law is on an ad hoc basis—all without the political accountability inherent in the legislative process.").

S.B. 95 does not "'provide explicit standards' for enforcement" and, therefore, is unconstitutionally vague. *Harris*, 311 Kan. at 822. Because there are no standards to guide conduct, there are no factual circumstances where S.B. 95 is valid. I see no reasonable way to construe the statute to avoid this concern because it is not this court's role to read a standard into the text of S.B. 95, particularly when the Legislature has shown its ability to impose such a standard in other related statutes. *In re Estate of Gardiner*, 273 Kan. 191, 214, 42 P.3d 120 (2002) ("We do not read into a statute something that does not come within the wording of the statute."); *Rooney v. Horn*, 174 Kan. 11, 16, 254 P.2d 322 (1953) ("Had the legislature by the original act or the amendment of 1947 intended to include merchandise vending machines it could have easily done so either in the original act or the amendment of 1947. The fact that it did not do so is persuasive that it was not the intention to include them.").

In my view, the Legislature's omission of any discernable standard means the physician's expert decision will inevitably be second-guessed by prosecutors, judges, and juries applying a personal and ultimately mysterious standard to the physician's conduct. But in our structure of government the Legislature makes the law, not those charged with enforcing it. Accordingly, I am convinced the constitutional presumption we normally attach to statutes is overcome by S.B. 95's improper delegation of the Legislature's role to "'establish minimal guidelines to govern law enforcement.'" *Harris,* 311 Kan. at 822 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 [1983]). I would reject S.B. 95 on these grounds alone.

\* \* \*

STEGALL, J., dissenting:  I dissent from today's opinion for all the reasons set forth at length in my dissent to our earlier opinion in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 707-78, 440 P.3d 461 (2019) (*Hodes I*) (Stegall, J., dissenting). There, I explained that the majority's imagined section 1 of the Kansas Constitution Bill of Rights

45

bears no resemblance at all—in either law or history—to the actual text and original public meaning of section 1. I explained that the "majority's decision is so consequential because it fundamentally alters the structure of our government to magnify the power of the state—all while using that power to arbitrarily grant a regulatory reprieve to the judicially privileged act of abortion" and that henceforth in Kansas, abortion will be "the judicially preferred policy tail wagging the structure of government dog." 309 Kan. at 707, 778 (Stegall, J., dissenting). As such, "the settled and carefully calibrated republican structure of our government must give way, at every turn, to the favored policy." 309 Kan. at 778 (Stegall, J., dissenting). And here we are.

Beyond that "brief summary . . . I will not swell the [Kansas] Reports with repetition of what I have said before." *Planned Parenthood of Southeastern PA. v. Casey*, 505 U.S. 833, 981, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (Scalia, J., concurring in part and dissenting in part). Instead, I make two limited observations, and will leave it at that.

First, it is noteworthy that the majority cannot bring itself to acknowledge the government's compelling interest in unborn human life. Yes, the majority maneuvers around this problem by skipping it in favor of its narrow tailoring analysis. But the truth is, the majority doesn't answer this question because it is so decidedly troublesome to the majority's new section 1 regime. For the majority, an interest in protecting unborn life— including the dignity of that life—is only "aspirational" with "many nuances and facets" that have "potentially far-reaching precedential effect." *Hodes & Nauser, MDs v. Kobach*, 318 Kan. __, ___, (*Hodes II*), slip op. at 23. For those unfamiliar with legalese, this translates to, "We don't want to tie our hands with such inconveniences."

Second, the dominant theme of the *Hodes I* opinion was the court's unsubstantiated allegation that both history and the Legislature had waged an unjust "war on women." 309 Kan. at 709 (Stegall, J., dissenting). S.B. 95 was "described as the moral

46

equivalent of legalized wife beating and spousal rape" and the majority claimed that "'the prevailing views justifying' these long-since-discredited misogynistic practices were 'manifested in a majority' of the drafters and ratifiers of the Kansas Constitution and of the Kansas legislators who criminalized abortion in 1862." 309 Kan. at 708 (Stegall, J., dissenting).

But now, I cannot help but notice that pregnant women have been quietly— decisively—evicted from this court's abortion jurisprudence. Replaced, it would seem, with genderless "pregnant person[s]" and "pregnant patients." *Hodes II*, 318 Kan. at ___, slip op. at 14, 29. Indeed, the only time pregnant women appear in today's decision, they are embalmed within quotations marks—indicating, I suppose, the prejudice and anachronism of the dust bin.

What is going on one wonders? The reader will, no doubt, understand.

I dissent.